## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: 13-CR-256 (CKK) |
| | : | |
| | : | |
| | : | VIOLATION: |
| v. | : | |
| | : | 26 U.S.C. § 7203 (Failure to File |
| | : | Corporate Income Tax Returns) |
| | : | |
| TROY WHITE, | : | |
| | : | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant TROY

WHITE agrees and stipulates that at all relevant times:

## INDIVIDUALS AND ENTITIES

1.      Defendant Troy White ("WHITE"), a resident of the City of New York, was the

sole owner and operator of Wytehouse Marketing, Inc. ("WYTEHOUSE"), a for-profit

corporation registered in the State of New York. WYTEHOUSE provided marketing services to

various clients, including political campaigns, with an emphasis on marketing in urban areas

through the use of "street teams." WHITE was responsible for filing a Form 1120 corporate

income tax return on behalf of WYTEHOUSE with the United States Internal Revenue Service

(the "IRS") that reported, among other things, WYTEHOUSE's gross receipts.

2.      EXECUTIVE A, a resident of the District of Columbia, was a named partner,

Chairman and Chief Executive Officer, and the majority owner of COMPANY A, a for-profit

corporation registered in the District of Columbia that provided accounting, management

consulting, and tax services. EXECUTIVE A also was the sole owner and operator of

COMPANY B, a for-profit corporation registered in the District of Columbia that served as a holding company for other companies owned by EXECUTIVE A.

3.      Belle International, Inc. ("BELLE") was a for-profit corporation that was registered in the District of Columbia.

4.      CAMPAIGN-1 was a political committee whose candidate was running for President of the United States during the 2008 federal primary election cycle.

5.      INDIVIDUAL A, a resident of the District of Columbia, was affiliated with CAMPAIGN-1 during the 2008 federal primary election cycle.

6.      INDIVIDUAL B, a resident of Austin, Texas, was a supporter of CAMPAIGN-1.

7.      INDIVIDUAL C, a resident of San Antonio, Texas, was a supporter of CAMPAIGN-1 and affiliated with CIVIC ORGANIZATION A, which maintained a tax-exempt status under Title 26, United States Code, Section 501(c)(4).

## BACKGROUND

8.      WYTEHOUSE operated under a fiscal year which began on May 1 of each calendar year and ended on April 30 of the following calendar year.  Defendant WHITE knew that he was required by law to file WYTEHOUSE's Form 1120 corporate income tax return with the IRS on or before July 15 of each calendar year.

9.      On or about June 19, 2008, defendant WHITE filed and signed WYTEHOUSE's Form 1120 corporate income tax returns with the IRS that reported, among other things, WYTEHOUSE's gross receipts of $138,408 for the 2005 fiscal year, and $111,789 for the 2006 fiscal year.

2

## WYTEHOUSE'S UNREPORTED GROSS RECEIPTS

10.     In fiscal years 2007 and 2008, WYTEHOUSE received approximately $608,750 in gross receipts related to services it provided in support of CAMPAIGN-1. EXECUTIVE A paid for these services with funds transferred from COMPANY A and COMPANY B, after CAMPAIGN-1 had declined defendant WHITE's offers to work directly for CAMPAIGN-1. WHITE did not report these gross receipts to the IRS, nor did he report any of his gross receipts for fiscal years 2007 through 2010, as required by law.

### *CAMPAIGN-1 Declines to Pay for WYTEHOUSE's Street Teams*

11.     Defendant WHITE marketed WYTEHOUSE to CAMPAIGN-1 in an effort to have CAMPAIGN-1 pay for WYTEHOUSE's street team services during the 2008 federal primary election cycle.

12.     On or about January 9, 2008, defendant WHITE sent an e-mail to a CAMPAIGN-1 official with a PowerPoint presentation describing how WYTEHOUSE could assist CAMPAIGN-1 through the use of street teams. Approximately three weeks later, WHITE, INDIVIDUAL A, and a CAMPAIGN-1 senior official exchanged a series of e-mails concerning whether CAMPAIGN-1 would employ WYTEHOUSE's street teams.

13.     On or about January 29, 2008, CAMPAIGN-1 rejected WYTEHOUSE's services in an e-mail the senior official sent to defendant WHITE and INDIVIDUAL A, in which the senior official wrote: "Unfortunately, we are not going to be able to use the street teams. As [INDIVIDUAL A] knows, I am a big fan of them and used them quite a bit . . . last cycle. I hope we can work together soon."

14.     On or about January 31, 2008, defendant WHITE sent a follow-up e-mail to INDIVIDUAL A and CAMPAIGN-1's senior official and stated: "I[']m still offering my services just in[ ]case your strategy has changed. We can cover the following markets for Super Tuesday [February 5, 2008]. . . ."

15.     Later that day, INDIVIDUAL A replied to defendant WHITE and CAMPAIGN-1's senior official and wrote: "[A]nd I am piping up saying we need your services. [CAMPAIGN-1 senior official] let's [find] some money. I will fight for it."

*EXECUTIVE A Finances WYTEHOUSE's*
*Street Teams in Support of CAMPAIGN-1*

16.     In or about February 2008, INDIVIDUAL A introduced defendant WHITE to EXECUTIVE A, whom INDIVIDUAL A described as a business owner in the District of Columbia who wanted to organize an effort to support CAMPAIGN-1.

17.     EXECUTIVE A directed defendant WHITE to put together a plan that included the costs associated with services WYTEHOUSE would provide in support of CAMPAIGN-1 during the upcoming Texas federal primary and caucus election on March 4, 2008. WHITE created a plan that included, among other things, the scope of WYTEHOUSE's services in support of CAMPAIGN-1, the benefits of employing street teams, and the costs associated with WYTEHOUSE's services, including how much it was going to cost to pay street team members in various Texas cities. EXECUTIVE A and WHITE agreed that EXECUTIVE A would pay WHITE to provide these services in support of CAMPAIGN-1 during the Texas federal primary and caucus election.

18.     Shortly after reaching an agreement with EXECUTIVE A, defendant WHITE hired individuals to assemble and organize street teams that would be paid to disseminate and

4

distribute materials prepared by CAMPAIGN-1, including posters, lawn signs, pamphlets, and stickers. The goal of this effort was to raise CAMPAIGN-1's visibility in several large cities in Texas, including Austin, Dallas, El Paso, Houston, and San Antonio.

19.     During this period, INDIVIDUAL A introduced defendant WHITE to INDIVIDUAL B, who would help organize street teams and paid canvassers in Austin, Texas. WHITE, EXECUTIVE A, and INDIVIDUAL B, after being introduced to each other by INDIVIDUAL A, communicated by telephone several times in advance of the Texas primary and caucus election.

20.     Also during this period, INDIVIDUAL B introduced defendant WHITE to INDIVIDUAL C. After their introduction, INDIVIDUAL C agreed to find individuals who would be paid to support CAMPAIGN-1 by serving as canvassers in advance of the Texas primary and caucus election. INDIVIDUAL C then contacted members of CIVIC ORGANIZATION A to recruit and organize paid canvassers in several smaller cities in Texas, including Brownsville, Corpus Christi, Lubbock, and McAllen.

21.     Beginning in or about the last week of February 2008, the paid street team workers and canvassers began disseminating and distributing CAMPAIGN-1's prepared materials. Defendant WHITE and INDIVIDUAL A maintained contact during this period, and INDIVIDUAL A arranged for CAMPAIGN-1's Texas offices to provide CAMPAIGN-1's prepared materials to the street team workers. INDIVIDUAL A also provided WHITE with confidential internal information from CAMPAIGN-1 regarding the itinerary and schedule for a high-profile individual who would be campaigning in Texas in support of CAMPAIGN-1. The paid street team workers and canvassers then were directed to attend these campaign events to

show support for CAMPAIGN-1 and disseminate and distribute CAMPAIGN-1's prepared

materials.

22.     On or about February 27, 2008, and on or about February 29, 2008,

WYTEHOUSE received a total of approximately $231,250 from BELLE to pay for the services

that the paid street team workers and canvassers would provide in support of CAMPAIGN-1

leading up to the March 4, 2008, Texas primary and caucus election.  On or about those same

dates, BELLE received a total of approximately $233,000 from COMPANY A, which wired the

funds from its corporate bank account in the District of Columbia to BELLE's corporate bank

account in the District of Columbia:

| COMPANY A Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Presidential Primary Election Date |
|---|---|---|
| $134,000 on February 27, 2008 | $133,250 on February 27, 2008 | Texas Federal Presidential Primary and Caucus on March 4, 2008 |
| $99,000 on February 29, 2008 | $98,000 on February 29, 2008 | |

23.     Following the Texas federal primary and caucus election, EXECUTIVE A agreed

to continue financing WYTEHOUSE's paid street team workers in support of CAMPAIGN-1

during several upcoming federal primary elections.  In addition, INDIVIDUAL A continued to

communicate with defendant WHITE to ensure that the paid street team workers had access to

enough supplies of CAMPAIGN-1's prepared materials.  Moreover, INDIVIDUAL C continued

to assist WHITE by finding individuals, many of whom were affiliated with CIVIC

ORGANIZATION A, to serve as paid canvassers for CAMPAIGN-1 in different locations.

24.     From in or about April 2008 through and including in or about May 2008,

WYTEHOUSE received a total of approximately $244,500 from BELLE in connection with the

services the paid street team workers and canvassers provided in support of CAMPAIGN-1

during the federal primary elections. During this same period, BELLE received a total of approximately $244,500 from COMPANY A, which wired the funds from its corporate bank account in the District of Columbia to BELLE's corporate bank account in the District of Columbia:

| COMPANY A Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Presidential Primary Election Dates |
|---|---|---|
| $7,500 on April 1, 2008 | $7,500 on April 1, 2008 | Federal Presidential Primary on April 22, 2008 |
| $63,000 on April 11, 2008 | $63,000 on April 11, 2008 | |
| $86,000 on April 21, 2008 | $86,000 on April 22, 2008 | |
| $88,000 on May 22, 2008 | $88,000 on May 23, 2008 | Federal Presidential Primary on June 1, 2008 |

25.    In or about May 2008, WYTEHOUSE also received a total of approximately $133,000 in additional funds from BELLE in connection with the services the paid street team workers and canvassers provided in support of CAMPAIGN-1 during the federal primary elections. This time, however, BELLE received a total of approximately $134,000 from COMPANY B, which wired the funds from its corporate bank account in the District of Columbia to BELLE's corporate bank account in the District of Columbia:

| COMPANY B Wire Transfers To BELLE | BELLE Wire Transfers To WYTEHOUSE | 2008 Federal Presidential Primary Election Dates |
|---|---|---|
| $57,000 on May 1, 2008 | $56,500 on May 2, 2008 | Federal Presidential Primaries on May 6, 2008 |
| $77,000 on May 6, 2008 | $76,500 on May 6, 2008 | |

26.    In summary, from in or about February 2008 through and including in or about May 2008, WYTEHOUSE received approximately $608,750 from BELLE to support

CAMPAIGN-1's efforts during several federal primary elections. During this same time period, BELLE received approximately $611,500 from COMPANY A and COMPANY B.

### FAILURE TO FILE WYTEHOUSE's 2007-2010 TAX RETURNS

27.    Defendant WHITE failed to file WYTEHOUSE's Form 1120 corporate income tax return with the IRS for its 2007 and 2008 fiscal years, which would have included gross receipts that WYTEHOUSE was paid for its work in support of CAMPAIGN-1 during the 2008 federal primary election cycle. WHITE also failed to file WYTEHOUSE's Form 1120 corporate income tax returns with the IRS for the 2009 and 2010 fiscal years:

| WYTEHOUSE Fiscal Year | Time Period Covered | WYTEHOUSE Gross Receipts | Tax Loss | Filing Deadline Date |
|---|---|---|---|---|
| 2007 | May 1, 2007 – April 30, 2008 | $507,300 | $8,329 | July 15, 2008 |
| 2008 | May 1, 2008 – April 30, 2009 | $297,815 | $1,859 | July 15, 2009 |
| 2009 | May 1, 2009 – April 30, 2010 | $129,095 | $5,622 | July 15, 2010 |
| 2010 | May 1, 2010 – April 30 2011 | $124,296 | $4,915 | July 15, 2011 |

28.    Defendant WHITE engaged in the conduct described above willfully and not by way of accident, mistake, or other innocent reason.

This statement of the offense is not intended to constitute a complete recitation of all facts known by defendant WHITE, but is, instead, intended to provide the necessary factual basis for the guilty plea.

RONALD C. MACHEN JR.
United States Attorney
D.C. Bar No. 447-889

By: _____
Loyaan A. Egal, New York Bar
Ephraim (Fry) Wernick, D.C. Bar No. 497-158
Assistant United States Attorneys
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530
loyaan.egal@usdoj.gov
ephraim.wernick@usdoj.gov
(202) 252-7899 (AUSA Egal)
(202) 252-7092 (AUSA Wernick)

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense.  Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

9/11/13

Date

Troy White
Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I have discussed this Statement of Offense with my client, Troy White, and I concur with his decision to stipulate to this Statement of the Offense.

9/11/13

Date

Ross A. Nabatoff, Esq.
Attorney for Defendant Troy White

10